IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STEELWORKERS OF AMERICA, AFL-CIO/CLC,<br><br>                Plaintiff,<br><br>    v.<br><br>PLIANT CORPORATION,<br><br>                Defendant. | No. 04-12489WGY<br><br>Judge William G. Young |

**DEFENDANT'S REPLY BRIEF IN SUPPORT
OF ITS RULE 12(b)(6) MOTION TO DISMISS THE COMPLAINT**

As described in the Introduction to its Opposition to the Defendant's Motion to Dismiss, Plaintiff's case is built upon two premises: first, that, upon shutdown of Defendant's Harrisville, Rhode Island plant, all of Defendant's employees suffered an "employment loss" within the meaning of the WARN Act even if they were given "replacement positions or transferred, [because] those positions [were] not substantially equivalent to their pre-shutdown employment;" and, second, that an employer such as Defendant "cannot evade the notice requirements of the Act by planning a phased shutdown of a plant and by employing individuals in a temporary capacity so that less than 50 employees will suffer an 'employment loss' within the statutory period." (Pl.'s Opp. to the Def.'s Motion to Dismiss ("Pl.'s Opp. Mem."), p. 2.) Defendant submits that both of these arguments (and an additional argument not referred to in its Introduction but raised by Plaintiff in Part A of its Memorandum) are directly refuted by the language of WARN, the Department of Labor's interpretive rules for WARN, and applicable case law -- including several of the same cases relied upon by Plaintiff.

**ARGUMENT**

1.  **PLAINTIFF MISCONSTRUES THE WARN ACT TEST FOR WHAT CONSTITUTES AN "EMPLOYMENT LOSS."**

The true WARN Act test for determining whether employees who continue working after a plant shutdown suffer an "employment loss" is whether the employees suffered a constructive discharge, not, as Plaintiff claims, whether they were given less than substantially equivalent employment.

Any doubt regarding this interpretation is easily resolved by reference to the interpretive rules issued by the Department of Labor, both the "final" rules and the proposed rules they replaced. In pertinent part, the DOL's final rules state that a terminated employee does not suffer an "employment loss" if the "employee is reassigned…as long as the reassignment does not constitute a constructive discharge or other voluntary termination." 20 C.F.R. § 639.3(f)(2) (1989). The DOL's earlier proposed rules stated that:

> Where a termination…is involved, an employment loss occurs upon the loss of full employment status. 'Full employment status' means full pay, benefits, and other employment entitlements. [20 C.F.R. § 639.3(f)(2) (1988), 53 Fed. Reg. 4884, 48891, 1988 WL 266733.]

Even more significantly, when it issued its final rules, the DOL explained the reason for the change in language as follows:

> A number of commenters questioned the use of the term 'full employment status' in section 639.3(f)(2). They argued that this concept, if broadly applied to mean that an employee can be reassigned only if he/she retains full pay and benefits, is inconsistent with the statutory definition of employment loss and with employers' rights to reassign workers.
>
> DOL recognizes that the comments have merit and that the 'full employment status' concept is capable of overbroad application. The regulations have been revised to delete the concept…
>
> It must be noted that the ability to reassign workers is not without limits. An employer may not vary the terms of a worker's

- 2 -

assignment so much as to constructively discharge (as discussed in greater detail below)[1] the employee. Language to this effect has been added to the regulation. [54 Fed. Reg. 16042, 16047.][2]

Any lingering doubt as to the invalidity of Plaintiff's assertion that an "employment loss" occurred because the work given to Defendant's employees represented less than substantially equivalent employment is certainly dispelled by the DOL's next statement:

> The question also has been raised as to whether an employment loss occurs if an employee retains full pay and benefits and other entitlements but is not required to report to work. DOL notes that neither WARN nor the regulations dictate the nature of work to be performed -- or whether work must be performed -- during a period of employment after notice of an impending plant closing or mass layoff has been given. [54 Fed. Reg. at 16048.]

In fact, as one of Plaintiff's cited cases notes, "[w]here a worker has ceased reporting to work but continues to be paid, at least one court has held that the employment loss begins when the payment ends." *Martin v. AMR Serv. Corp.,* 877 F. Supp. 108, 113 (E.D.N.Y. 1995), *aff'd, sub nom Gonzalez v. AMR Services Corp.*, 68 F.3d 1529 (2d Cir. 1995) (citing *United Mine Workers, Dist. 2 v. Helen Mining Co.*, No. 93-1131, 1994 WL 287611, at *8 (W.D. Pa. April 18, 1994)); *cf.*, *Headrick v. Rockwell Int'l. Corp.*, 24 F.3d 1272, 1280 (10th Cir. 1994) (noting that the District Court, whose decision it affirmed, had found that "Congress meant 'employment loss' to cover only employees truly idled or deprived of income").

It is also worth noting that Plaintiff's suggested test for employment loss in a case, such as this, where the employees remain employed in the same plant by the same employer, is far

---

[1] Despite this parenthetical statement, the DOL merely refers to its "earlier discussion of the law of constructive discharge," in its later discussion regarding transfers to a different site of employment where, again, the DOL deleted language requiring that the transfer be "substantially equivalent in terms of pay and working conditions" and replaced it with language requiring only that "an offer of reassignment to a different site of employment should not be deemed a 'transfer' if the new job constitutes a constructive discharge." 20 C.F.R. at § 639.5(b)(2); 54 Fed. Reg. 16054.

[2] All of the language excised from the quoted material deals with issues irrelevant to this case, *i.e.*, job-finding and retraining activities.

less demanding than the test statutorily applied in those instances where there is a relocation of the employer's business. In those cases, WARN provides that there is no employment loss if:

> (A) the employer offers to transfer the employee to a different site of employment within a reasonable commuting distance with no more than a 6-month break of employment; or
>
> (B) the employer offers to transfer the employee to any other site of employment regardless of distance with no more than a 6-month break in employment, and if the employee accepts within 30 days of the closing or layoff, whichever is later. [29 U.S.C. § 2101(b)(2).]

Notably, while some courts have read a constructive discharge threshold into the situation described in (A), *e.g.*, *Moreno v. DFG Foods, LLC*, No. 02 C 4019, 2003 WL 21183903 (N.D. Ill. May 21, 2003), the statute itself regards a complete break of employment for up to 6 months without triggering an employment loss. The situation referred to in (B) is, by its very nature, one in which the employer could offer terms and conditions which are far less favorable to the employee than those the employee previously enjoyed because, regardless of the location of the new work site, and regardless of the conditions of employment offered (including, e.g., a temporary position with a total lack of job security), and even if there is a complete break of employment for an extended period of up to 6 months, there is no loss of employment if the employee accepts the offer -- even if the forced imposition and refusal of those terms would clearly qualify as a constructive discharge. Seen in this context, Plaintiff's argument that the employees in this case (who were offered and accepted employment at their same job location without any break in employment) suffered a loss of employment is clearly groundless.

The cases cited by Plaintiff hardly support its assertions that (1) the WARN test for "employment loss" is loss of substantial equivalency of jobs rather than constructive discharge, or (2) that lack of substantially equivalent conditions amounts to a constructive discharge. The factual context of *Local 819, IBT v. Textile Deliveries, Inc.*, No. 99 CIV. 1726 (JGK), 2000 WL

1357494 (S.D.N.Y. Sept. 20, 2000) bears no resemblance to this case. There, one employer closed its operations, terminating 77 employees, and a successor, alleged (but denied by defendants) to be its joint employer and alter ego, took over. While the first employer notified its employees that "they could submit job applications to [the successor employer] for consideration for employment," according to the plaintiff's complaint (which, for purposes of the defendant's motion for summary judgment, had to be accepted as true) application forms were selectively distributed, each was evaluated anew and measured against the successor employer's own employment criteria. 2000 WL 1357494 at *2. Though all but 18 of the 77 employees submitted job applications, the successor hired only 25 of them, designated those "employees as 'new employees,' as opposed to 'rehire' or 'transfer/job change,'" and deprived them of the benefits and "union scale wages" which they had previously received. It was in this context that the court noted that the 25 employees "were terminated with the possibility of applying for new positions as to which there is a dispute whether the positions were substantially equivalent to their prior positions" and, in that context, "It cannot be said as a matter of law that these employees did not suffer an employment loss." 2000 WL 1357494 at *5. Notably, the court emphasized that the WARN test for "employment loss" is that of "constructive discharge." *Id*.

The court in *Moreno v. DFG Foods, LLC*, dealt with a factual setting in which employees earning $9.00, $12.00 and $13.52 an hour were offered the opportunity to transfer to another, larger, facility of the same parent corporation, where they would be hired as new employees at a rate of between $5.15 and $6.40 per hour. Ruling only on the legitimacy of a motion for class certification, the court implied, but did not state, that the employees so treated may have been shown to be constructively discharged. 2000 WL 21183903.

In the instant case, of course, there are no allegations even remotely suggesting that Defendant required those employees whom it kept on to submit employment applications, that it

- 5 -

engaged them as new hires, or that it effectuated any cuts in their pay or benefits. In fact, as Plaintiff asserts in its Opposition Memorandum, the only distinction between the employees' jobs before and after the shutdown was that they "had completely different job duties after the shutdown, relating to disassembling and guarding the plant -- a far cry from their previous production, maintenance, administrative, and managerial duties." (Pl.'s Opp. Mem., p. 9.) Although Plaintiff attempts to add one other distinction, *i.e.*, that the "temporary position provided by the employer provided no job security," Plaintiff does not offer any basis for the intimation that the previous positions held by the employees at the plant did provide job security. Thus, there is not a hint of a claim that the employees who formerly had "administrative and managerial duties" were other than employees at will; and, as the facts of this case show, the collective bargaining agreement which Plaintiff had with Defendant did not provide "job security" to the production and maintenance employees either.

It is manifestly clear that, in themselves, the assignments offered and accepted by Defendant's employees were not so onerous or unpleasant as to constitute a constructive discharge.

> The elements for proof of constructive discharge have been discussed in a number of cases decided by Federal and State appellate courts,...and there is general agreement on the elements pertinent to a decision in this case. In a frequently cited decision, the United States Court of Appeals for the First Circuit has stated that in order for a constructive discharge to be found, 'the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977). The test is met if, based on an *objective* assessment of the conditions under which the employee has asserted he was expected to work, it could be found they were so difficult as to be intolerable.
>
> [M]ere dissatisfaction with the nature of assignments...and dissatisfaction with compensation have been held insufficient to establish a triable question of fact on the issue of constructive

- 6 -

discharge." [*GTE Products Corp. v. Stewart*, 421 Mass. 22, 34-35,
653 N.E.2d 161, 169 (Mass. 1995)[3] (internal citations omitted).]

If, as the DOL and several courts have noted, the elimination of *all* job responsibilities does not constitute an "employment loss" for the employee who continues to be paid then, to use Plaintiff's terminology (Pl.'s Opp. Mem., p. 10), "bluntly put," the employees who were offered and accepted positions after the plant shutdown and who continued to work there suffered no employment loss within the meaning of WARN.

> 2. **PLAINTIFF'S ARGUMENT THAT DEFENDANT IS LIABLE BECAUSE IT USED EVASIVE TACTICS TO REDUCE "EMPLOYMENT LOSSES" BELOW 50 CANNOT BE SUSTAINED.**

Plaintiff acknowledges that WARN itself effectively calls for advance notice of a plant closing which will result in an employment loss for 50 or more employees within any 90 day period. (*Id.*, p. 6, n.5.) At the outset of Part A of its Argument, however, Plaintiff makes the novel assertion that, because Defendant *planned* to close the plant before it actually did so, and because its initial plan was to terminate all of the employees within 90 days thereafter, and because there were 50 employees working at the plant when the plan to close was formulated, there were therefore a sufficient number of employees to require notice "even if there were still individuals on Defendant's payroll 90 days after its planned shutdown announcement." (*Id.*, p.7.)

In an attempt to divine support for this novel reading of WARN, Plaintiff looks to DOL interpretive rule § 639.5(a)(1)(i) and (ii) for the proposition that WARN notice must be given in advance of employment adverse actions both *planned* and *taken*. (*Id.*) (emphasis in original.) But Plaintiff conveniently ignores the express language of the lead sentence to the cited rule, *i.e.*, that it is subject to "certain exceptions discussed in paragraphs (b), (c) and (d) of this section." Notably, paragraph (b)(1) of the same section states that "Notice is not required in certain cases

---

[3] Given the fact that Plaintiff has alleged a total of exactly 50 employees in the plant, failure to establish that the post-shutdown jobs represented a constructive discharge for any individual

- 7 -

involving transfers, as described under the definition of 'employment loss' at § 639.3(f) of this part"; and, as discussed above, the DOL's current § 639.3(f)(2) is very much involved in this proceeding. Plaintiff's argument also flies in the face of § 639.2 of the DOL Rules which states that "Not all layoffs and plant closings are subject to the Act, and certain employment thresholds must be reached before the Act applies." In any event, as one of Plaintiff's cited cases makes clear, the DOL Rule upon which Plaintiff mistakenly relies "is a purely interpretive rule, unpromulgated under the Administrative Procedure Act," that "it does not carry the force of law" and the courts "are in no way bound to afford it any special deference under *Chevron United States, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1994)." *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1282 (10th Cir. 1994).[4]

The claim that, for purposes of determining whether WARN applies, the magnitude of employment loss must be measured at the time a plant shutdown is being "planned" has other obvious problems. Thus, for example, if an employer makes plans to shut down a plant with 55 employees but, before it puts its plan into action, 10 of those employees retire, Plaintiff would presumably contend that WARN notice was required, notwithstanding the fact that less than 50 employees suffered an employment loss. In every plant shutdown case where less than 50 employees suffered an employment loss, inquiry would have to be made as to the specific date the plan was made and how many employees were employed as of that date. Would that be the date a board of directors voted, partners reached a consensus, or a sole proprietor decided to shut the plant down? The date a CEO approved and sent on to his subordinates a consultant's report recommending shutdown? The date the last of several potential lenders denied a loan needed to make essential improvements to the plant? The shutdown of literally any plant with an employee

(..continued)
employee retained would defeat Plaintiff's case.

[4] In fact, the Rule language quoted by Plaintiff is specifically prefaced with "the employer should" rather than "the employer must."

- 8 -

population which had ever exceeded but had ultimately shrunk below 50 would become the subject of protracted judicial inquiry into the employer's intent.  Offers of transfer or employment, including those which even Plaintiff would concede are "substantially equivalent" would be subject to question if their effect was to lower the "employment loss" population below 50, *i.e.*, if those offers were "planned" at the time the employer planned to shut down the plant, WARN notice requirements would not be triggered but, if the offers were planned after the date the employer formulated its plan to shut down the plant, they would.

Plaintiff's argued standard would invite a similar analysis of amorphous intent here because, while Plaintiff's Complaint alleges that certain actions took place on certain dates, it contains no allegations regarding Defendant's "plans" or the dates these plans were allegedly made.  Thus, while Plaintiff emphasizes that "Defendant announced that the entire plant would close on October 15, 2004" and that Defendant "did not suggest that any jobs would be saved or protected,"  (Pl.'s Opp. Mem., p. 7) Plaintiff's conclusion, that "Defendant planned to terminate all of the employees at the Harrisville Plant before or on October 15, 2004" (*Id.,* p. 8) is not pled; and that conclusion is not necessarily warranted for, it is not inconceivable that, at the time of the announcement, Defendant intentionally avoided telling its employees that jobs would continue to be available for some of them after October 15 so as not to plant seeds of acrimony.

Such analyses are irrelevant to the purposes of WARN and the clear and unambiguous language Congress used in expressing those purposes.  "Only an 'employment loss' is a WARN event." *International Alliance of Theatrical and Stage Employees v. Compact Video Services, Inc.* 50 F.3d 1464, 1468 (9th Cir. 1995).  In a case involving plant shutdown, only a resulting employment loss for 50 or more employees within a 90 day period can be a "WARN event." 29 U.S.C. §§ 2101(a)(2), 2102(d).  The planning of a shutdown which may or may not go according

11863927\V-3

to plan is *not* an event which, in itself, can produce liability under WARN, regardless of how many employees are considered within the plan.

Finally, Plaintiff argues that "an employer cannot evade the notice requirements of the Act by planning a phased shutdown of a plant and by employing individuals in a temporary capacity so that less than 50 employees will suffer an 'employment loss' within the prescribed period." (Pl.'s Opp. Mem., p. 2.) The single District Court case it cites for this proposition does not so state, and it bears no resemblance or relevance to this proceeding. The facts presented in *Amatuzio v. Gandalf Systems Corp.*, 994 F. Supp. 253 (D. N.J. 1998) involved a series of terminations and layoffs, followed by a total plant shutdown. The District Court first found that, during a period of less than thirty days, *i.e.*, April 25 and May 2, 1994, fifty-four employees suffered employment loss as a consequence of a plant closing and "Therefore, there was a 'plant closing' as defined by WARN." 994 F. Supp. at 276. Granting summary judgment on behalf of those employees, the court then considered the plight of a group consisting of between 38 and 42 employees who were "laid off" on January 14, 1994. 994 F. Supp. at 260. Finding the circumstances of these employees "more difficult to determine," the court denied both parties' motions for summary judgment, and, in doing so, stated that, in order to avoid liability, the employer would be required to show that the January 14 layoff and the subsequent plant closing were "'the result of separate and distinct action and causes and are not an attempt by the employer to evade the requirements of this chapter.' [citing 29 U.S.C. § 2101(d)]" 994 F. Supp. at 277. It can be argued that, given the facts presented in the *Gandalf Systems* case, the defendant's liability toward the employees laid off on January 14 should not have been so "difficult to determine." Because they were laid off, not terminated, it is possible that their "employment loss" could not have taken place until six months later, July 14, 1994, well after the plant was completely shut down, 29 U.S.C. § 2101(a)(6)(B), and that their actual "employment

- 10 -

loss" was therefore caused by the shutdown, not the layoff.  Alternatively, it can be argued that, because the plant shutdown affecting more than 50 employees occurred as of May 2, 1994, it was incumbent upon the defendant to show that the employment loss suffered on July 14 by the January 14 layoffs was, indeed, the "result of separate and distinct actions and causes." *Id.*  In any event, given this context the District Court's statement that "Defendants should not be able to escape this burden [of proving separate and distinct actions and causes] because a staged layoff satisfied the basic plant closing definition" is understandable.  994 F. Supp. 277.  Plaintiff's attempt to boot-strap this isolated and extraneous statement into a rule of law that continued "temporary" employment is a sham if it results in employment loss to less than 50 employees within a 90 day period is, to put it mildly, specious.

     The statutory language cited in the *Gandalf Systems* case provides further evidence of the futility of Plaintiff's argument here.  Notably, while the language of 29 U.S.C. § 2102(d) prohibits employers from undertaking certain actions "to evade the [notice] requirements" of the Act, it narrowly defines the scope and timing of even those actions.  It clearly states that the evasion prohibitions apply only to those actions which result in "employment losses for 2 or more groups at a single site of employment…which occur within any 90-day period." *Id.*  Clearly, if the employment losses occur outside any 90-day period, the evasion prohibitions do not apply, *i.e.*, under those circumstances "evasion" becomes "compliance."  In short, Congress addressed and specifically defined what should be considered employer "evasions" of WARN.  Plaintiff's claim that other completely unrelated employer actions should likewise be declared evasions by the judiciary is groundless.

     In the final analysis, Plaintiff's real grievance is that the scope of the WARN Act is limited and arbitrary.  The Act's thresholds are, without question, arbitrary in many respects.  It requires notice only in those shutdown situations causing employment loss to 50 or more

employees during any 30 (or, as discussed above, as much as 90) day period; it mandates notice only in those mass layoff situations involving either at least 33 percent of the employees, numbering 50 or more, or 500 employees (regardless of the percentage).  It categorizes a layoff as an "employment loss" only if it lasts for more than 6 months.  It only applies to employers with 100 or more employees.  The practical impact of a shutdown upon employees working for an employer who has a total of 99 employees or an employee who works in a plant comprised of 49 employees is surely no less severe than that inflicted upon employees of an employer whose circumstances meet the threshold tests for notice.  Because the Act clearly defines employment loss as "an employment termination, other than a discharge for cause, voluntary departure, or retirement,"  § 2101(a)(6), the voluntary departure or retirement of one of Defendant's employees prior to the shutdown of the Harrisville plant would have reduced the "employment loss" group of employees to 49 and made WARN remedies unavailable to them.  Similarly, Defendant's retention rather than termination of any one of its employees would likewise have reduced the "employment loss" group of employees to 49 and made WARN remedies unavailable to them.  The Complaint establishes that Defendant chose to retain more than one, because it refers to "workers who continued to work at the plant."  (Complaint ¶16)  The WARN Act makes it clear that neither the remaining 48 or less employees, nor those retained, were entitled to notice.

## CONCLUSION

Based on the above arguments and authorities and those set forth in Defendant's initial Memorandum in Support of its Motion to Dismiss the Complaint, the Complaint in this proceeding should be Dismissed in its entirety.

        Respectfully Submitted,

        /s/ Susan G. Fentin
        Susan G. Fentin, Esq.
        BBO No. 632962
        Counsel for Pliant Corporation
        Skoler, Abbott & Presser, P.C.
        One Monarch Place, Suite 2000
        Springfield, Massachusetts  01144

Dated:  April 15, 2005        Tel.: (413) 737-4753/Fax: (413) 787-1941

        Respectfully Submitted,

        /s/ Richard L. Marcus
        Richard L. Marcus (01761676)
        Counsel for Pliant Corporation
        SONNENSCHEIN NATH & ROSENTHAL LLP
        8000 Sears Tower
        233 South Wacker Drive
        Chicago, IL  60606

Dated:  April 15, 2005        Tel.: (312) 876-8000/Fax: (312) 876-7934

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the above document was served upon Plaintiff's counsel, Warren H. Pyle and Nicole Horberg Decter, Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C., 18 Tremont Street, Suite 500, Boston, MA 02108, by electronic filing and first-class, U.S. mail, postage prepaid on April 15, 2005.

        /s/ Susan G. Fentin
        Susan G. Fentin, Esq.